

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00426-CV

_____

IN THE MATTER OF D.P.

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-125888-25

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Appellant David Pierson[1] challenges the juvenile court's order waiving its jurisdiction and transferring him to a criminal district court for prosecution as an adult. *See* Tex. Fam. Code Ann. § 54.02(a). In two points, Pierson argues that the evidence was insufficient to support the juvenile court's probable-cause finding that he committed the alleged offenses or to justify his transfer to adult criminal court. Because we hold that sufficient evidence supported the juvenile court's finding that it had probable cause to believe that Pierson had committed the alleged offenses and that evidence of the relevant statutory factors supported the juvenile court's decision to waive jurisdiction and transfer Pierson, we will affirm.

### Background

On April 29, 2025, Alvin Sweet was shot and killed, and another person in the area, Josmary Laucho, was injured. The police investigation of the shooting began at the apartment complex where Sweet had crashed his car after driving away from where he had been shot. Laucho had been shot by a stray bullet while walking to her car at the complex, which is adjacent to a park. After finding Sweet's tire tracks from the park to the complex and shell casings at the park, investigators determined that the shooting had occurred there. Investigations revealed that Sweet was a drug dealer and had arranged to meet Zayne Burris, then seventeen, at the park that night. Burris

---

[1]We use pseudonyms for the appellant, for his family, and for other juveniles involved in the case. *See* Tex. Fam. Code Ann. § 56.01(j).

was arrested. When Detective Matthew Handler spoke to Burris at the jail where he was being detained, Burris told him that he and some friends had planned to steal THC vape pens from Sweet, and he named Pierson and several others as responsible for the shootings.

Because Pierson was sixteen at the time of the alleged offenses, any proceeding against him arising from the offenses fell within the Juvenile Justice Code. *See* Tex. Fam. Code Ann. §§ 51.03, 51.04(a). Juvenile courts have exclusive jurisdiction over proceedings under the Juvenile Justice Code. *See id.* § 51.04. However, the State filed a "Petition Requesting the Juvenile Court to Consider Discretionary Transfer to Criminal Court (Waiver of Juvenile Court Jurisdiction)."

The petition contained six paragraphs alleging offenses related to the shootings of Sweet and Laucho. For Sweet's death, the State alleged that Pierson had committed capital murder,[2] murder under Penal Code Section 19.02(b)(1),[3] and murder under Penal Code Section 19.02(b)(2).[4] In the remaining three paragraphs, the State alleged

---

[2]"A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and: . . . the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery." Tex. Penal Code Ann. § 19.03(a)(2).

[3]"A person commits an offense if the person: . . . intentionally or knowingly causes the death of an individual." *Id.* § 19.02(b)(1).

[4]"A person commits an offense if the person: . . . intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." *Id.* § 19.02(b)(2).

that Pierson had committed aggravated robbery of Sweet, had discharged a firearm "at or in the direction of . . . Sweet," and had committed aggravated assault with a deadly weapon of Laucho. After a hearing, the juvenile court decided to waive its jurisdiction and transfer Pierson. The court stated at the hearing's conclusion that "the level of planning" for the robbery of Sweet "d[id] not indicate juvenile delinquency or juvenile behavior" and that it was "more appropriate for [Pierson] to be in the adult system for this." In its "Order of Transfer to a Criminal District Court and Waiver of Jurisdiction," the juvenile court found that there was probable cause to believe that Pierson had committed all the alleged offenses except murder under Section 19.02(b)(2). The juvenile court further found that the offenses were against a person; that Pierson was of sufficient sophistication and maturity to be tried as an adult; that it was contrary to the best interests of the public for the juvenile court to retain jurisdiction; and that because of the seriousness of the offenses alleged and Pierson's background, the community's welfare required criminal proceedings. Pierson now appeals.

## Discussion

### A. Juvenile Transfers and Standard of Review

Because the State alleged that Pierson had committed a felony, the juvenile court could waive its jurisdiction and transfer Pierson to the criminal district court if "after a full investigation and a hearing," the court determined that (1) "there [wa]s probable cause to believe that [Pierson had] committed the offense alleged" and

4

(2) "because of the seriousness of the offense alleged or the background of [Pierson,] the welfare of the community require[d] criminal proceedings." *Id.* § 54.02(a). The State had the burden to persuade the juvenile court by a preponderance of the evidence to waive its jurisdiction and transfer the case. *See In re J.H.*, No. 02-24-00370-CV, 2025 WL 356497, at *3 (Tex. App.—Fort Worth Jan. 30, 2025, pet. denied) (mem. op.) (noting State's burden in transfer proceeding); *In re M. B.*, No. 14-23-00969-CV, 2024 WL 3041398, at *4 (Tex. App.—Houston [14th Dist.] June 18, 2024, no pet.) (mem. op.); *see also In re A.P.*, Nos. 01-25-00423-CV, 01-25-00424-CV, 01-25-00425-CV, 01-25-00428-CV, 01-25-00549-CV, 01-25-00550-CV, 01-25-00551-CV, 2025 WL 3454615, at *3 (Tex. App.—Houston [1st Dist.] Dec. 2, 2025, no pet.) (noting that juvenile court may "base its determination of what the welfare of the community requires on either the seriousness of the offense or the background of the juvenile; it need not find that both necessitate criminal proceedings").

In determining whether to waive jurisdiction and transfer the case, a juvenile court must consider, among other matters,

> (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
>
> (2) the sophistication and maturity of the child;
>
> (3) the record and previous history of the child; and

(4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

Tex. Fam. Code Ann. § 54.02(f).

Although the juvenile court must consider these factors, they are not elements that the State must prove. *See id.*; *J.H.*, 2025 WL 356497, at *3. Further, Section 54.02(f) "does not mandate that any particular factor be true, state that the factors are exclusive, or limit the purpose for which the . . . factors may be considered." *J.H.*, 2025 WL 356497, at *3 (quoting *Ex parte Thomas*, 623 S.W.3d 370, 382 (Tex. Crim. App. 2021)). But "[t]he transfer of a juvenile offender from juvenile court to criminal court for prosecution as an adult should be regarded as the exception, not the rule." *Thomas*, 623 S.W.3d at 376. "[T]he operative principle is that, whenever feasible, children and adolescents below a certain age should be 'protected and rehabilitated rather than subjected to the harshness of the criminal system.'" *Id.* (citation omitted).

A juvenile may appeal a juvenile court's transfer order, and "[t]he requirements governing an appeal are as in civil cases generally." Tex. Fam. Code Ann. § 56.01(a), (b), (c)(1)(A). We generally review a juvenile court's transfer decision for abuse of discretion, but sufficient evidence must support the juvenile court's exercise of discretion.[5] *In re J.J.T.*, 711 S.W.3d at 695; *In re D.I.R.*, 650 S.W.3d 172, 176 (Tex.

---

[5]In *Moon v. State*, the Court of Criminal Appeals required factually supported, case-specific Section 54.02(f) findings for a transfer order. 451 S.W.3d 28, 47 (Tex. Crim. App. 2014), *overruled by Thomas*, 623 S.W.3d 370. Citing *Moon*, appellate courts generally used a two-step review of a juvenile court's ultimate decision to transfer a

6

App.—El Paso 2021, no pet.) ("[T]he court's ultimate waiver decision is reviewed for an abuse of discretion.").

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

---

child to criminal court, first considering whether sufficient evidence supports the juvenile court's findings and, if so, then reviewing whether the transfer decision was nevertheless an abuse of discretion. *Id.*; *see, e.g.*, *In re A.B.*, No. 02-18-00274-CV, 2019 WL 983751, at *3 (Tex. App.—Fort Worth Feb. 28, 2019, no pet.) (mem. op.). But then in *Thomas*, the court overruled the case-specific-findings requirement and rejected as "unworkable" any standard of review established under *Moon*. 623 S.W.3d at 381 (stating that "[t]o the extent that *Moon* established a new standard of review for sufficiency of a juvenile transfer order on direct appeal, that standard was tied to the requirement that the [juvenile] court enter case-specific fact findings justifying the transfer of jurisdiction," and because the court was overruling "*Moon*'s requirement of case-specific fact-finding, that type of sufficiency review is unworkable"). However, the court did not establish a new standard of review, recognizing that since *Moon*, the legislature had amended the law to designate the Texas Supreme Court as the high court with jurisdiction to review a juvenile court's transfer order. *Id.* at 382–83 (citing Tex. Fam. Code Ann. § 56.01). Nevertheless, the Texas Supreme Court has—for now—continued to apply the two-step standard of review. *In re J.J.T.*, 711 S.W.3d 687, 695 & n.21 (Tex. 2025) (noting that the parties had not asked it to use a different standard). Further, even aside from *Moon*, in determining whether a juvenile court has abused its discretion, we may consider whether the court had sufficient information on which to exercise its discretion. *In re S.D.*, No. 05-24-01484-CV, 2025 WL 1284657, at *2 (Tex. App.—Dallas May 2, 2025, no pet.) (mem. op.).

**B. Sufficient Evidence Supports Probable Cause**

Pierson argues in his first point that "[t]here was insufficient evidence to support the [juvenile] court's finding that the child before the court committed the offense alleged." That is, he challenges the factual sufficiency[6] of the evidence to support a probable-cause finding under Family Code Section 54.02(a)(3). *See* Tex. Fam. Code Ann. § 54.02(a)(3); *In re D.L.N.*, 930 S.W.2d 253, 257 (Tex. App.— Houston [14th Dist.] 1996, no writ) (evaluating factual sufficiency of juvenile court's probable-cause determination).

The question for a juvenile court at a transfer hearing is not whether the State presented sufficient evidence to establish the child's guilt. *In re A.A.*, 929 S.W.2d 649,

---

[6]Although Pierson does not specify whether he challenges the legal or factual sufficiency of the evidence under this point, because he sets out a standard for factual sufficiency—against the great weight and preponderance of evidence—we read his point to challenge factual sufficiency. *See* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 366 (1960) (discussing "insufficient evidence"/"against the great weight" challenges); *see also* William Powers, Jr., *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L. Rev. 515, 518— 19 & n.11 (1991) (same). As with reviewing a juvenile court's ultimate transfer decision, this court has previously reviewed a juvenile court's probable-cause decision under Section 54.02 for sufficiency of the evidence. *In re J.S.*, No. 02-23-00465-CV, 2024 WL 976526, at *7 (Tex. App.—Fort Worth Mar. 7, 2024, no pet.). The First Court of Appeals has recently applied the standard for reviewing probable cause in criminal cases to a juvenile court's probable-cause determination and held that the determination should be reviewed as a question of law rather than for sufficiency of the evidence. *A.P.*, 2025 WL 3454615, at *4–5 (applying standard described in *Guzman v. State*, 955 S.W.2d 85, 87–91 (Tex. Crim. App. 1997)). Pierson's brief applies a factual sufficiency standard to the juvenile court's probable cause determination, neither party has asked us to consider applying a different standard, and that is the standard we apply here. *See J.J.T.*, 711 S.W.3d at 695 & n.21 (declining to consider a different standard of review when parties had not asked it to).

653 (Tex. App.—San Antonio 1996, no writ). Instead, the juvenile court must consider, among other things, whether the evidence is sufficient to establish probable cause. The standard for probable cause "is much lower than the burden of proof necessary to convict." *M. B.*, 2024 WL 3041398, at *5; *see In re K.A.*, No. 10-25-00016-CV, 2025 WL 1911998, at *3 (Tex. App.—Waco July 10, 2025, pet. denied) (noting that Section 54.02 requires probable cause, "not proof of guilt"). "Probable cause is based on probabilities"; it requires "more than mere suspicion" but less evidence than would be required to support a finding by a preponderance of the evidence. *In re C.M.M.*, 503 S.W.3d 692, 702 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Probable cause exists when sufficient facts and circumstances would warrant a reasonably prudent person's belief that the suspect had committed the alleged offense. *M. B.*, 2024 WL 3041398, at *5 (citing *C.M.M.*, 503 S.W.3d at 702); *In re S.B.*, No. 02-19-00048-CV, 2019 WL 3334615, at *6 (Tex. App.—Fort Worth July 25, 2019, pet. denied) (mem. op.); *see Cornealius v. State*, 870 S.W.2d 169, 172 (Tex. App.—Houston [14th Dist.] 1994), *aff'd*, 900 S.W.2d 731 (Tex. Crim. App. 1995).

At the hearing, the State relied on the testimony of Matthew Handler, a homicide detective with the North Richland Hills Police Department, to establish probable cause. Pierson asserts that Handler's testimony "did not meet the low standard of probable cause or sufficient evidence to prove that [Pierson] was at the scene or committed murder." His brief points out categories of evidence that the juvenile court did *not* have before it:

9

- "No non-party witness to [Pierson] being at the scene of the shooting";

- "No ballistic evidence tying the guns seized by the police to the crime";

- "No fingerprint or other forensic evidence tying [Pierson] to the crime scene or weapons";

- "Nothing incriminating was retrieved from [Pierson]'s home";

- "Nothing was reviewed from [Pierson]'s cell phone";

- "No cell tower data placing [Pierson] at the crime scene"; and

- "No unambiguous circumstantial evidence that [Pierson] conspired to commit a crime."

He further asserts that the primary evidence that the juvenile court did have—the testimony of the other alleged participants (introduced by way of the detective's testimony)—was untrustworthy.[7]

Handler testified about the alleged offenses, how his investigation started, and how the investigation led him to Pierson.

- Sweet was a drug dealer, and Pierson's friend Burris regularly bought drugs from Sweet.

- Burris had bought some THC vape pens from Sweet, but one of the pens was "short in some of the wax . . . and some of the battery," so

---

[7]Pierson does not address whether, if the evidence was insufficient to show that he shot Sweet or Laucho, the evidence was sufficient to show probable cause under the law of parties. *See J.S.*, 2024 WL 976526, at *2, *5 (applying law of parties to probable-cause determination); *In re B.M.*, No. 01-18-00898-CV, 2019 WL 1388561, at *14 (Tex. App.—Houston [1st Dist.] Mar. 28, 2019, no pet.) (mem. op.) (noting that juvenile court may make its probable-cause finding based on the law of parties). Because the record contains sufficient evidence to show that Pierson participated in the shooting, we do not address the applicability of the law of parties.

Burris planned to request 300 dollars' worth of pens from him and to take them without paying.

- Burris proposed the idea to his friends through Instagram messages, stating, "Who's down with getting back on the plug who scammed me?" Pierson responded, "Yes," and said to another member of the group, "Let me go with you[,] [Owen]." In that series of messages among the group, Jorge Harris stated, "So we take him off the radar is what you saying," which Handler understood to mean, "[W]e are going to kill Mr. Sweet."

- According to Burris in his interview with Handler, however, when the group met up with Sweet, the shooting did not start until Sweet ran over the foot of one the people in the group:

    > [Burris] said when Mr. Sweet pulled up the—he and [Owen Matthews] were at the window, and Mr. Sweet the driver side window, they began asking him, "Okay, where's the money? Where are the vapes?" And he stated that as Mr. Sweet began to . . . reach, you know, get the vape pens[,] [Matthews] reached into his pocket. That led [Burris] to then reach into his pocket where he said he was holding a firearm. [Matthews] pulls out a firearm from his waistband and [Burris] said that [Matthews] told him that when [Matthews] fired the shot it was because Mr. Sweet ran over his foot.

- After Matthews fired a shot, "the others that were holding a gun"—including Pierson, who Burris said had a .223 rifle—started to shoot as well. "At that time, Mr. Sweet [wa]s driving away from the scene in an attempt to flee."

- Burris claimed that he was not one of the ones who shot at Sweet. In other words, according to Burris, although he planned to steal from Sweet, and a member of his group said in messages planning the offense that they would "take [Sweet] off the radar," Burris did not plan Sweet's shooting and did not participate in it.

- Officers found .223 and .22 caliber shell casings at the scene where Sweet had been shot and a 9-millimeter shell casing nearby.

- While Burris said that Pierson had a .223 rifle and Mathews had a Glock, Handler also interviewed Harris, who claimed that Pierson had carried a pistol.

- Burris told Handler that the firearm that Matthews "was holding is now at [Pierson's] house," while the rifles were at another group member's home. Just as Burris told Handler, a search of the other group member's house turned up two rifles—a .223 and a .22.

- While police were surveilling Pierson's house, he and two other people left his house and drove off "at a high rate of speed." Pierson stopped at another group member's home, and when he left there, officers initiated a traffic stop of his vehicle and saw a Glock in plain view on the floorboard where Pierson was sitting.

- Officers detained Pierson for possessing the weapon.

Pierson points out that most of Handler's evidence came from statements by Burris or another accomplice, and he argues that the accomplice testimony is inherently untrustworthy because the testimony is from a corrupt source. He further points out that Handler did not say what, if anything, he may have promised Burris in exchange for his statement; that Burris told the detective that Pierson had a rifle that night but Harris said that Pierson had a pistol; and that Burris "conveniently" testified that he alone had not fired any shots. Pierson concludes that the testimony "was tainted" and was information "that a reasonable person would not in good conscious rely upon." We disagree that the testimony at the hearing does not support probable cause.

The juvenile court could rely on Handler's testimony in determining probable cause. *See D.I.R.*, 650 S.W.3d at 180 ("[A] juvenile court may rely on the testimony of

12

law enforcement officials to support a probable-cause finding."); *In re K.R.B.*, No. 04-95-00856-CV, 1996 WL 460027, at *2 (Tex. App.—San Antonio Aug. 14, 1996, no writ) (not designated for publication) (stating juvenile court had discretion to consider officer's testimony concerning probable cause); *Edwards v. State*, No. 05-91-00185-CV, 1991 WL 258726, at *2 (Tex. App.—Dallas Dec. 3, 1991, writ dism'd w.o.j.) (not designated for publication) (holding that sufficient evidence supported juvenile court's probable cause determination even though only evidence came from investigating officers).

Further, unlike at a criminal trial or juvenile disposition proceeding, no accomplice corroboration is required when a juvenile court is determining probable cause under Section 54.02. *Compare* Tex. Fam. Code Ann. § 54.02 (governing juvenile court's waiver of jurisdiction and transfer of child to criminal court and containing no provision that accomplice testimony be corroborated), *with id.* § 54.03(e) (providing that child cannot be adjudicated delinquent based on accomplice testimony "unless corroborated by other evidence tending to connect the child with the alleged delinquent conduct"), *and* Tex. Code Crim. Proc. Ann. art. 38.14 (providing that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed"). Thus, although Pierson challenges the trustworthiness of Handler's sources, in evaluating probable cause at a transfer hearing, the juvenile court was not prohibited from considering statements made by accomplices. *See In re D.D.C.,*

No. 13-22-00239-CV, 2022 WL 11429990, at *8 (Tex. App.—Corpus Christi–Edinburg Oct. 20, 2022, pet. denied) (mem. op.). At this stage of proceedings, the State was not required to provide corroborating evidence of accomplice testimony. *See J.J.T.*, 698 S.W.3d 320, 331 n.4 (Tex. App.—Houston [1st Dist.] 2023), *rev'd on other grounds*, 711 S.W.3d 687; *see also B.M.*, 2019 WL 1388561, at *13 (stating that juvenile court could consider accomplice statement); *In re D.J.*, 909 S.W.2d 621, 623 (Tex. App.—Fort Worth 1995, writ dism'd w.o.j.) (holding that accomplice statements were admissible because "a judge in a transfer hearing is permitted to consider evidence that might be inadmissible in a criminal trial").

Further, "[a]s statements against interest, accomplice statements can provide probable cause." *J.J.T.*, 698 S.W.3d at 331; *see Chavez v. State*, No. 01-07-00563-CR, 2008 WL 5263404, at *2–3 (Tex. App.—Houston [1st Dist.] Dec. 18, 2008, no pet.) (mem. op., not designated for publication) (holding accomplice's statement inculpating appellant was a statement against penal interest and therefore trustworthy); *Cornealius*, 870 S.W.2d at 172 (stating that statements against penal interest may be sufficient to establish probable cause). Burris's statement to Handler was against Burris's penal interest because it was an admission that it was his idea to meet up with Sweet to commit a criminal offense, that he recruited the others and participated, and that the shooting occurred in the course of committing that offense. *See Yancey v. State*, No. 03-23-00251-CR, 2025 WL 2369482, at *2 (Tex. App.—Austin

14

Aug. 15, 2025, no pet.) (mem. op., not designated for publication) (discussing law of parties in context of murder committed during robbery).

Additionally, other evidence connected Pierson to the events of that night. Pierson's participation in the planning via Instagram—including his asking for a ride—is evidence that Pierson knew that he would be participating in a criminal offense against Sweet when the group met that night. In that same messaging, one of the group mentioned "tak[ing] [Burris] off the radar." Further, when Pierson was detained, he had in his possession a gun matching the description of a gun that had allegedly been used in the offense. *See In re H.Y.*, 512 S.W.3d 467, 479–80 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). The juvenile court could consider that evidence in its probable cause determination even though no ballistic evidence introduced at the hearing affirmatively tied the gun to the offense. Finally, the juvenile court was entitled to credit Handler's testimony about the investigation regardless of whether some of the witnesses he had interviewed provided contradictory statements about who had used which weapon. *See D.D.C.*, 2022 WL 11429990, at *8.

The juvenile court determined that sufficient facts and circumstances warranted a reasonably prudent person to believe that Pierson had committed the alleged offenses. Because that determination was not against the great weight and preponderance of the evidence, we overrule Pierson's first point.

15

**C. Sufficient Evidence to Support Transfer**

In his second point, Pierson argues that the evidence was not factually sufficient to justify his transfer to adult criminal court. Pierson challenges the sufficiency of the evidence to support the Section 54.02(f) factors that the juvenile court had to consider before waiving jurisdiction and transferring him. We disagree that the court had insufficient evidence to support its transfer decision.

If the juvenile court waives jurisdiction, its transfer order must state the reasons for waiving jurisdiction, *see* Tex. Fam. Code Ann. § 54.02(h), but the order need not contain case-specific findings, *see In re T.H.*, No. 02-24-00159-CV, 2024 WL 3458027, at *6 (Tex. App.—Fort Worth July 18, 2024, no pet.) (mem. op.). Here, the juvenile court found in its order that there was probable cause to believe that Pierson had committed the alleged offenses; stated that the juvenile court had considered the four Section 54.02(f) factors; and found that Pierson was "of sufficient sophistication and maturity to be tried as an adult" and that the alleged offenses were against a person. We will summarize the evidence regarding the Section 54.02(f) factors and then explain why the evidence was sufficient to support the juvenile court's exercising its discretion to waive its jurisdiction and order Pierson transferred to criminal court.

**1. Nature of offense**

With respect to the first Section 54.02(f) factor, the alleged offenses were against persons. *See* Tex. Fam. Code Ann. § 54.02(f)(1); *See In re J.D.*, No. 02-23-00177-CV, 2023 WL 6152620, at *6 (Tex. App.—Fort Worth Sept. 21,

16

2023, pet. denied) (mem. op.). Moreover, the alleged offenses were serious, and "[t]he nature and seriousness of the specific alleged offense, alone, may justify the juvenile court's waiver of jurisdiction 'notwithstanding other [S]ection 54.02(f) factors, so long as the offense: (1) is substantiated by evidence at the transfer hearing, and (2) is of sufficiently egregious character.'" *T.H.*, 2024 WL 3458027, at *6 (quoting *In re Z.M.*, No. 02-21-00213-CV, 2021 WL 4898851, at *5 (Tex. App.—Fort Worth Oct. 21, 2021, no pet.) (mem. op.)).

Pierson contends that the State failed to put on sufficient evidence to prove that he was at the scene of the alleged offense. However, we have already rejected Pierson's contention that insufficient evidence supported a probable cause determination, and we therefore disagree that the State failed to put on sufficient evidence to show that he was at the scene of the shooting.

### 2. Pierson's sophistication and maturity

Regarding Pierson's sophistication and maturity, to provide evidence of this and other factors, the State called Keanetta Brown, a court intake officer at Tarrant County Juvenile Services, who testified about Pierson's behavior while in county custody and about a psychological evaluation of Pierson. *See* Tex. Fam. Code Ann. § 54.02(d) (providing that before a transfer hearing, "the juvenile court shall order and obtain a complete diagnostic study, social evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offense"). The

17

psychologist's report discussed, among other things, Pierson's maturity and sophistication.

The psychologist who conducted the evaluation found that Pierson was polite "and exhibited age-appropriate social skills," that his level of maturity was age-appropriate, and that his level of sophistication appeared to exceed that of same-aged peers. But the assessments appeared to be based largely on Pierson's self-reporting of his history, and it was not always clear from the evaluation report how some of his statements related to the psychologist's conclusions. For example, Pierson claimed that he had been involved in mixed martial arts and that his hands were registered as weapons, and despite the juvenile nature of that claim, the psychologist included it in the section explaining that Pierson had an above-his-age level of sophistication.[8]

Pierson also reported that he has held jobs in the past, which can show maturity.[9] Further, the psychologist found that Pierson did not have an intellectual

---

[8]Pierson's mother testified that he "tries to act like he can be hard," i.e., that he tries to act more tough and "street smart" than he actually was. The psychologist stated in her report that "[i]t seems unlikely that [Pierson] would try to appear more involved in negative activity than he actually was for the current evaluation." But that assessment assumed that Pierson was mature and sophisticated enough to understand both the importance of the evaluation and how his statements could affect the evaluation. The psychologist did not explain how or if she determined that Pierson had such an understanding. However, Pierson does not complain about this conclusion.

[9]Pierson said that when his family lived in California, he would run away for weeks to a month at a time. He described living independently with "an older homie"

disability, has an IQ in the average range of intellectual functioning, and has a "strong ability to learn." The psychologist found Pierson's thinking to be "logical and goal-directed" and found no evidence of disordered thought processes. The psychologist further noted that Pierson acknowledged that he had been accused of capital murder and articulated sympathy for the deceased.

Pierson's mother also testified about this factor, and her testimony supports Pierson's argument that his going along with friends did not show maturity. She testified that in her opinion, Pierson was "mature in a lot of ways" and "immature in a lot of ways, and especially when it comes down to being able to effectively pick friends to be around on a basis where they're enhancing his life, and they're not bringing something into his life that doesn't need to be there."

**3. Pierson's record and previous history**

The juvenile court did not make specific findings related to the third and fourth factors, but the juvenile court's order stated that the court had considered the factors in making its decision, and Pierson argues that those factors weigh against the decision to waive jurisdiction and transfer him to criminal court.

---

and said that at that time, he worked providing lawncare services to pay for his own rent and food. If true, his ability to work to pay to support himself shows a certain level of maturity and sophistication. But Pierson's mother denied to the psychologist that Pierson had run away in California. She said that Pierson had once stayed with some people she did not know for about a week, but she indicated this had happened after the family had moved to Texas. At the hearing, she denied that he had lived independently for any period of time in California, saying that he had been permitted to go visit friends but had only ever lived with her.

19

As to the third factor, the record contains contradictory information, as Pierson and his mother provided conflicting statements about his history.

- Pierson told the psychologist that he tried marijuana at age 14 or 15 and did not like it. However, during his detention intake, Pierson said that he first smoked marijuana at age 9 or 10 and smoked regularly. Pierson's mother said that his statement was "completely inaccurate." However, Pierson tested positive for marijuana in May 2025.

- Pierson reported that, when he lived in California, he associated with gang members. But he explained that the gang members were children that he had grown up with who were not "like that" until high school, when they changed. His mother similarly appeared to describe "those kids" as friends who "lived on our street . . . in our neighborhood" and whom Pierson had known his whole life. There was no indication in the record that Pierson was around these alleged gang members when they engaged in any gang activity or if he had any association with them other than knowing them from the neighborhood. He did not have any gang associations in Texas. *Contra In re C.M.*, No. 14-24-00223-CV, 2024 WL 4234514, at *11 (Tex. App.—Houston [14th Dist.] Sept. 14, 2024, no pet.) (mem. op.) (noting that juvenile's history indicated that he had been active in gangs).

- Pierson had truancy issues in California but had been attending school more regularly since moving to Texas.

- Pierson's only previous run-in with law enforcement had been on one occasion when he had attempted to interfere with law enforcement's detention of Burris in connection with a minor-in-possession offense and had then run from law enforcement. Pierson had been charged with evading arrest, resisting arrest, and interfering with public duties. He had received a supervisory caution[10] for those offenses.

---

[10]"Supervisory caution is a 'summary disposition' that can be made by a probation officer . . . or other authorized person." *J.H.*, 2025 WL 356497, at *2, n.2; *see* Tex. Fam. Code Ann. § 52.03 (addressing when a law-enforcement officer authorized by that title may dispose of a child's case without referral to juvenile court or charging the child in a court of competent criminal jurisdiction).

- Pierson complied with his curfew and chores at home, and his discipline level in detention had been outstanding.

## 4. Prospects of rehabilitation and protecting the public

Finally, as to the fourth factor, "the prospects of adequate protection of the public and the likelihood of rehabilitation of the child by use of procedures, services, and facilities currently available to the [j]uvenile [c]ourt," Pierson contends that his "progress in detention and his openness to treatment should indicate that [he] is entitled to whatever services are available to him for the next two years" and that "[a] waiver of jurisdiction precludes [him] the very programs designed for the types of charges faced by" him.

Brown testified about the availability of services for Pierson:

- She stated that the Texas Juvenile Justice Department (TJJD) provided "a whole broad [array] of rehabilitative services."

- She further testified that there was a likelihood that Pierson could be rehabilitated if he were able to use the services and facilities available to the juvenile court through TJJD and the Tarrant County Juvenile Probation Department. Brown opined that based on Pierson's outstanding behavior in detention, he had shown an ability to conform to the requirements of society.

- But Brown also testified that, based on a discussion with her supervisor, she did not believe that Pierson had time to complete the programs offered by TJJD. Pierson was seventeen and one month at the time of the hearing, and Brown explained that if he were adjudicated in the juvenile system, he would have less than two years before he aged out. Due to a waiting period before he could be transported to TJJD, the time for him to complete the Capital and Serious Offender Program or other programs offered by TJJD "would be inadequate."

The juvenile court also had some evidence before it that Pierson had unmet—and possibly serious—psychological needs.

- Pierson told the psychologist evaluating him that he had experienced suicidal ideation multiple times and said that he had been participating in therapy since he was "little" but had not received therapy in Texas. He also reported that in the past, he had experienced auditory hallucinations, including voices telling him to kill himself.

- On the other hand, Pierson's mother denied that he had experienced any mental health problems before the family moved to Texas and denied that he had ever received any mental health treatment. She did state, however, that he had access to counseling at his California school "[i]f he [had] wanted it."

- Pierson indicated that he was not currently experiencing those issues, and nothing in the record indicated that he has been diagnosed with a mental health condition that would make him a danger to the public.

- The psychologist reported that Pierson had been "traumatized by experience of childhood adversity," including the experience of a friend being killed when Pierson was fourteen. She further opined that Pierson "exhibits difficulties consistent with Post-Traumatic Stress Disorder." Although Pierson was not in need of inpatient psychiatric treatment, his evaluation suggested "that monitoring of [his] potential need for outpatient psychiatric treatment is warranted."

**5. Application**

We conclude that the juvenile court had factually sufficient evidence on which to support its transfer decision. As for the first factor, the alleged offenses were indisputably against "the person of another," and the evidence further showed that the alleged offenses were serious and egregious. Thus, not only is this factor supported by factually sufficient evidence, but it also weighs heavily in favor of the juvenile court's decision. *See T.H.*, 2024 WL 3458027, at *6.

Regarding the second factor, the juvenile court had sufficient evidence regarding Pierson's maturity and sophistication to support the transfer. Although the juvenile court was presented with conflicting evidence regarding Pierson's maturity and sophistication, that evidence was subject to the juvenile court's interpretation. *See A.F.*, No. 02-23-00457-CV, 2024 WL 725511, at *5 (Tex. App.—Fort Worth Feb. 22, 2024, no pet.) (mem. op.)).

Pierson argues that the psychologist's opinion of his maturity and sophistication is not borne out by the record, and he asserts that he was not the "moving force" behind the plan regarding Sweet and that it takes no maturity or sophistication to be enticed to participate in an offense. However, the purpose of this factor is not to determine whether a juvenile has the same level of maturity and sophisticated planning skills as the average adult. Rather, the purpose is to determine whether the juvenile appreciates "the nature and effect of his voluntary actions and whether they were right or wrong" *J.H.*, 2025 WL 356497, at *5 (quoting *A.F.*, 2024 WL 725511, at *5), and whether he "is capable of understanding the proceedings against him[ and] could assist attorneys in his defense," *M. B.*, 2024 WL 3041398, at *7 (citing *Bell v. State*, 649 S.W.3d 867, 892 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd)).

Pierson had been initially detained for unlawfully carrying a firearm, and he told the psychologist that he had the gun in his possession because he was "trying to help a friend out," that he had not wanted the gun at his house, and that he had been

arrested while attempting to take the gun back to the friend. From these statements and Handler's testimony, the juvenile court could have found that Pierson understood that the gun had been used in an offense and that he was trying to get rid of the evidence before it could be found and connected to him. His actions presented evidence that Pierson could appreciate the nature and effect of his actions and whether they were right or wrong. *See T.H.*, 2024 WL 3458027, at *7 (stating that juvenile demonstrated sophistication and maturity through the steps he took to evade culpability and concluding that "the juvenile court could have reasonably determined that [the juvenile] could appreciate the nature and effect of his actions").

Additionally, Pierson's statements to the psychologist indicated that he understood the offenses of which he had been accused, and the juvenile court could consider that Pierson seemed to understand the proceedings against him. Further, the assessment of Pierson's intellectual ability indicates that he could assist attorneys in his defense. *See In re E.M.P.*, Nos. 14-25-00176-CV, 14-25-00178-CV, 14-25-00596-CV, 2025 WL 2419942, at *5 (Tex. App.—Houston [14th Dist.] Aug. 21, 2025, no pet.) (mem. op.) (holding that factor supported transfer when appellant had average intellectual sophistication and had no history of special education or diagnoses of intellectual disability). There was no evidence that Pierson was too immature and unsophisticated to understand right from wrong, to understand the allegations against him, or to assist in his own defense. The juvenile court's finding as to this factor was not against the great weight and preponderance of the evidence.

24

The juvenile court also had conflicting evidence as to the third factor. There was no dispute that Pierson's only previous criminal history was for minor offenses and that he had excellent behavior in detention. That is some evidence that weighs against the transfer. But for the rest of Pierson's history, he and Mother gave conflicting information, and that evidence was subject to the juvenile court's interpretation. *See id.* Additionally, while in California, Pierson was friends with gang members but did not, apparently, engage in any criminal activities with them or associate with them while they did so. But that is not the case in his relationship with Burris. He was present with Burris when he was previously detained by law enforcement, tried to prevent law enforcement from detaining Burris, continued to socialize with Burris after having received a supervisory caution for those offenses, and then agreed to participate in a criminal offense with him. The juvenile court could consider Pierson's escalating behavior. Further, Pierson tested positive for marijuana in a May 2025 positive drug test, contradicting his statement to the psychologist that he had only tried it once when he was younger. Any finding by the juvenile court that Pierson's history favored transfer was not against the great weight and preponderance of the evidence.

Regarding the fourth factor, the juvenile court had some evidence that Pierson had experienced some serious mental health issues, but the court did not have evidence that he was currently experiencing those issues, and the psychologist who conducted Pierson's evaluation did not opine that he had a mental health condition

that made him a danger to the community. However, the juvenile court also could—and did—consider the serious nature of the offenses alleged in evaluating whether the protection of the public and the likelihood that Pierson could be rehabilitated weighed in favor of transfer. *Bell*, 649 S.W.3d at 896–97. As for rehabilitation, Brown testified that Pierson was a good candidate, but she further testified that juvenile services would not have sufficient time to rehabilitate him given his age and the waiting period for transfer to TJJD where a rehabilitative program would be available. Pierson's age was a relevant factor for the juvenile court to consider for this factor because "the resources of the juvenile court are designed to assist and rehabilitate children, not adults." *Id.*; *see In re T.L.*, No. 02-19-00200-CV, 2019 WL 4678565, at *9 (Tex. App.—Fort Worth Sept. 26, 2019, no pet.) (mem. op.) (considering child "would possibly age out [of the juvenile system] before he could complete participation in beneficial programs"). *Cf. Coffin v. State*, 885 S.W.2d 140, 146 (Tex. Crim. App. 1994) (noting that court could conclude from testimony that "the resources of the juvenile system were inadequate to ensure appellant could be rehabilitated before once again released into the general public").

Thus, the juvenile court had evidence that Pierson did not have time to be rehabilitated while in the juvenile system, and there was no evidence presented to contradict that testimony. However, even if the juvenile court did not accept Brown's assessment of whether Pierson would have sufficient access to services for rehabilitation, a juvenile court's transfer order may be upheld even if not every factor

26

weighs in favor of transfer. *See In re T. J. E. G.*, No. 03-24-00382-CV, 2025 WL 337115, at *4 (Tex. App.—Austin Jan. 30, 2025, no pet.) (mem. op.) (citing *Bell*, 649 S.W.3d at 886–87).

In sum, considering all the factors and the pertinent evidence together, we cannot say that the juvenile court had factually insufficient evidence on which to support its decision. *See J.H.*, 2025 WL 356497, at *3; *A.F.*, 2024 WL 725511, at *2, *3 (noting that "no one factor is vital to the juvenile court's [transfer] decision so long as there is sufficient evidence overall" and holding that "the great weight of the evidence—of each factor and overall—supported transfer").

Pierson does not argue that even if sufficient evidence supports the juvenile court's findings, the court nonetheless abused its discretion by transferring him to criminal court. However, even if Pierson's brief could be read as raising an abuse-of-discretion argument, the record does not show that the juvenile court acted without reference to guiding rules and principles by waiving its jurisdiction and transferring Pierson to criminal court. *See In re D.T.*, Nos. 01-24-00568-CV, 01-24-00569-CV, 2025 WL 208492, at *11 (Tex. App.—Houston [1st Dist.] Jan. 16, 2025, no pet.) (mem. op.). We overrule Pierson's second point.

## Conclusion

Having overruled Pierson's two points, we affirm the juvenile court's order.

27

/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  January 30, 2026